A I want to focus on three errors that compel reversal and present the clearest path forward. First, on the issue of disclosure, the board apparently found that LabTech expressly discloses the claimed elements. This was error. The claims require a film with certain pharmacokinetics for its two active ingredients, buprenorphine and naloxone. But LabTech does not describe a buprenorphine naloxone film. It simply identifies a buprenorphine naloxone tablet as one of 19 drugs of interest known at the time and lists some of the pharmacokinetics of the tablet. The identification of 19 known drugs in a tablet form and their preferred pharmacokinetics along with a wish that each could be turned into a film with similar pharmacokinetic properties is not a disclosure of the claimed invention. Simply put, a wish is not a disclosure. Just to be clear, is this an enablement argument? No. We do have an enablement argument. This is a disclosure argument. This is much like the Apple case that we discussed in our brief where there was a heading for future research. What we have in Table A of LabTech are known existing tablet products and a wish for a film with similar pharmacokinetics. So we don't have an example or a claim or anything of the sort to a film with those pharmacokinetics. And as your honors well know, anticipation is a strict standard. This is not a case where there's a disclosure of a film with those pharmacokinetics simply. But the law cannot be that you always have to have a disclosure of an actual reduction to practice of some product for that reference to then be anticipating a claim to that product. You need to have a disclosure, either express or inherent, of all of the elements of the claim. And the elements of the claim here are a film with these pharmacokinetics, a film with the claimed CMAX, with the claimed AUC for both buprenorphine and naloxone. We don't have that here. And as to one of those pharmacokinetics, the naloxone AUC of Claim 17, you can look far and wide in LabTech. You won't find a disclosure of the naloxone AUC of Claim 17. It's just not there. What about in the PTO, as I understand it, you can argue your claims have rise and fall together, or you can argue claims separately. And I don't see where Claim 17 was argued separately before the PTAP. Certainly Claim 17 was treated separately before the PTAP. And there's been no argument by BDSI that we've waived any argument about Claim 17. Well, the question is whether it rises and falls with other claims. I don't believe it would. Where is that site in the record for where it was argued before the PTAP separate from the claim for which it depends? Claim 19 appears to be argued separately at 388. That is at 388. But I don't see something for Claim 17. I'll have to give you that A site during my rebuttal time. But certainly as to Claim 17, setting aside the issue of whether this was in the PTO, BDSI has made no argument as to waiver. However, there's an express finding about Naloxone AUC in the opinion that seems to be erroneous. We had thought that it was an inherency discussion, but BDSI says inherency has nothing to do with this. It's a red herring. So I've addressed the Naloxone AUC. And I would add that BDSI, when it's looking for the Naloxone AUC, it doesn't even point to anything in Lab Tech. It points to a different document. So this is at BDSI's brief at 26. It's citing to A648, which is a European Medicines Agency study. The second issue that I'd like to focus on is of enablement. The board reversed the burden of proof on the issue of enablement, placing it on the patent owner instead of on BDSI. What does that mean? Sorry, go ahead. What does that mean? Is it your view is that the patent owner has the burden of production but not the burden of persuasion? And that the board misapplied and put the burden of persuasion on you? Yes. Okay. And that's clear from two places. These are examples in the opinion. At A19, the board concluded, we are not persuaded that Lab Tech is not enabled with respect to buprenorphine. And at A23, we are not persuaded that Lab Tech is not enabled with respect to Naloxone. So by the use of the word persuaded, that to you suggests or requires that we interpret what the board's analysis was to mean that they put the burden of persuasion on you? Yes, and BDSI doesn't contend otherwise. In BDSI's brief, what it said is that the board properly placed the burden on us of persuasion on the patent owner. I thought it was the burden of production. No. I don't believe so, Judge Stokes. I think you're wrong about that. Well, what do we do about Amgen and impacts and those opinions? Let's assume that I read them as on their face saying when it comes to the enablement question of a prior art reference and an invalidity challenge, if the question of enablement gets invoked in the proceeding, the burden is on the patent owner to prove that the prior art reference is not enabled, that there is some presumption of enablement. Aren't we bound by those decisions? Carefully read, those decisions speak to the burden of production, not persuasion. Amgen, I think, is a good case in point. The issue there was the applicability of a presumption of enablement. But 35 U.S.C. 116E, which is in the IPR setting, says that it places the burden of persuasion on the petitioner on all issues. This is, I think, akin to the issue that arose with respect to Section 282 in the In Re Cyclo Ben Supreme case. Dynamic Drinkware is, I think, to similar effect. The burden of persuasion always, always rests with the petitioner. So there can't be any question here either as to whether or not the burden of production was met. There was a lengthy declaration by Dr. Johnston. It addressed these issues. I think it's 833 through 404. And there's nothing on the contrary. I understand what your side argued to the patent board on this question of enablement of the Lab Tech reference. It was specifically scoped to two arguments. One is this must have been a mistake for Lab Tech to talk about Suboxone. I'm not sure if that's the right pronunciation. Because Suboxone is about sublingual absorption of the tablets, and Lab Tech is really geared towards GI tract absorption. So there must be some mistake. And then the second argument is this notion that the bioavailability of buprenorphine, whether through GI tract versus sublingual absorption, is dramatically different. And so those were the issues that the patent board took on and made the findings that it made. And then what I saw in your briefing was a fairly dramatic expansion of the enablement argument going into other issues, other areas, identifying perhaps other problems with whether the Lab Tech reference is enabling. And so my first question to you is, aren't we as a court of review restrained to look at the actual issues presented to the tribunal below and the findings that the tribunal made with respect to those specific arguments? The answer to the latter question is yes. At 8399 through 404, though, I know that the issue of routine experimentation was addressed. And certainly the issue of enablement generally was raised in the sections of the appendix that I cited to. So these issues were squarely raised. And again— I guess what I'm wondering is should the patent board be charged with looking at any and all arguments that you made against the proposed 103 rejection in answer to a possible 102 rejection? It refused to even address the issue of undue experimentation in the context of obviousness. Well, that's a separate question for trying to discern the correctness under the applicable standards of review of the patent board's decision on the anticipation rejection. Your Honor, again, I think the issue was fairly raised as to enablement generally. And routine experimentation while under a heading of obviousness was put forward, and the board refused to address it. It said enablement has nothing to do with obviousness. Well, except I thought here you were using the whole discussion that preceded this last set of questions dealt with you're using enablement for purposes of anticipation, not for obviousness, right? Yes. And 383 through 404—I'm into my time. That's okay. 383 through 404 of the appendix we believe relate to enablement and also to the issue of routine experimentation. And one other thing, BDSI hasn't raised any waiver issue. I don't know what else we would be citing to or have cited in the appendix. There's not a word, not a word in BDSI's brief about waiver. In most instances, BDSI just didn't take on the arguments that we raised in our initial brief. So I think that given where we are, it seems to me that that ought to have been raised by BDSI. And, again, there do happen to be, irrespective of their not having raised an issue of waiver, those 20 pages, 21 pages of the appendix speak to enablement and routine experimentation. I just wanted to get to the third issue. Before we get there, can I just sort of—before we got into the process questions, we were talking about the board's findings with respect to enablement. And notwithstanding that they used the word persuaded, I thought—I understood, and I think Judge Chen alluded to this, that your main argument about, even under the burden of production, which you acknowledge you had, was that lab tech is limited to GI absorption films and, therefore, it's not anticipatory. Right? I mean, wasn't that the main argument with respect to enablement? Certainly there is that. Okay. And the board concluded, and one, let's say for the sake of argument, correctly, that it's not, that lab tech uses the word predominantly, and that they also talk about orally disintegrating films, which means even if it's going to go primarily for the GI track, some of it is going to be absorbed in the month just by definition. So why is the board incorrect in its conclusion, leaving aside the burden question? Well, the issue of routine experimentation was clearly raised, and I pointed to those pages earlier. No, but can you just deal with what I'm saying? The issues that I think were clearly raised and that the board dealt with, why was the board— We haven't raised any issue as to this, whether it requires only use of gastrointestinal. That's not an issue that we've raised in this appeal. So that's a section of the board's reasoning that we haven't challenged in this appeal. Well, but you've challenged its conclusion that there's anticipation, and the subpart of that, which is that there can be no anticipation because the lab tech reference is not enabled. Isn't that part of this appeal? Certainly that's part of the appeal, but the issue of routine experimentation we believe was raised. The issue of disclosure in this wish disclosure thing was also raised. That's at A3, 1, 2, 3, 3. I know, but I'm not—okay. Well, I just want you to answer my question, which is on the point of whether or not lab tech is limited to GI absorption films. You're saying that you agree that it's not limited to GI absorption films. Well, I think our position is it's limited. It's focused on GI films, and this is even the other science expert said the general teaching is how to reduce absorption through the oral mucosa. What we're not contending is that all absorption need be through the oral mucosa. That is not a contention. So I guess—I'm sorry. Maybe it's me, but is the answer to the question, is lab tech limited to GI absorption films, your answer is it is limited or it's not limited? It's limited to films that are chiefly or predominantly through GI absorption. That's the best I can do, Your Honor. Okay. And the other science expert I think was to the same effect as was Judge Andrews in the district court decision that we submitted as our 28J letter. Might I proceed to the third? Sure. Just very briefly because you've already run over your rebuttal time, but I understand that we've asked you a lot of questions. So just take another two minutes. Okay. So the board, we believe, based on the evidence submitted, which was a copious declaration, it couldn't have concluded that there was enablement without undue experimentation. And we've pointed out all the variables in lab tech. There isn't any guidance how to get to a film with those pharmacokinetics. And the board recognized there's no embodiment of a film with buprenorphine and naloxone with these pharmacokinetics. And there was also agreement with BDSI that not every lab tech film would produce the claimed pharmacokinetics. So we think it's clear that it's not enabled. I also just for a moment wanted to mention obviousness. So the board didn't identify any element that was missing from lab tech that was supplied by Ying. He didn't provide a reason why the person of ordinary skill in the art would have combined them or why the person of ordinary skill in the art would have reasonably expected success in combining them. Those are things that ought to be in the board's opinion. They aren't. We're entitled to them as a matter of administrative law. We cite it to cases to that effect. And I think as recently as June in the Encino case, the Supreme Court said as much, so that we're entitled to decisions from an administrative body. For all these reasons, the board's findings should be reversed. Okay. Thank you. We'll restore two minutes of rebuttal. And to keep it even, why don't we give the other side an additional four minutes starting off. Don't feel compelled to use all of them. Thank you, Your Honor. Lee Bromberg for BDSI. I'm accompanied by Danielle Harrett. And we believe that the record below provides substantial evidence for the anticipation finding by Lab Tech and certainly substantial evidence for the obviousness finding by Lab Tech in view of Yang, and therefore that those results should be affirmed by this court. What about the other side's expert report describing how it's somewhat tricky to make these films and we shouldn't be so quick to presume that just because it exists in tablet form, we can get the exact same pharmacokinetics from a film version and know how to build a film that will do that. Okay. Well, there was overwhelming evidence in support of the proposition that you could take the tablet and turn it into a film form based on the teaching of Lab Tech. And one of the most important was the admissions by Dr. Johnston himself, Harvey's expert. Among those admissions, first of all, he said that the person of skill in the art set a very high bar. Ph.D. in pharmacology, a couple years' experience, familiarity with how to make film, as well as familiarity with the pharmacokinetics of buprenorphine and naloxone. So with that definition, you have a very highly educated person of skill in the art. Secondly, Dr. Johnston's declaration was all premised on the proposition that Lab Tech was limited to paraoral administration for dissolution in the gut. What my colleague at the bar said, they don't stand by that because the board said, no, it's not. It's based upon both orally disintegrating film. Those are words right in Lab Tech, orally disintegrating film. And Dr. Johnston admitted that when you have orally disintegrating film, you get some absorption through the oral mucosa, even if you subsequently swallow the whole thing. In fact, he testified in his deposition, I don't think you would make a film just to be swallowed. So that was his own testimony. So his admissions really undermine the claim that you wouldn't know how to do it. And of course, if you look at- Well, it depends what the question is that you're asking. And I think your friend was suggesting that, that their position is that it was predominantly dealing with GI absorption. Well, the Lab Tech reference does talk about GI absorption, but it has a specific section which says, now admittedly, if you have a pharmaceutical film, you put it in your mouth, and it's an orally disintegrating film, you're going to have some absorption in the oral mucosa. But we're aiming to think of ways that we can reduce that to get more of it to go into the gut. Which is clearly different than this patent. That is different from this patent, Your Honor. But the teaching, a reference teaches for everything that's in that reference. And it not only teaches you about how to adjust the pH so that you try to promote gastrointestinal absorption, but it also teaches you that if you have an orally disintegrating film, it's going to dissolve in your mouth and you're going to have absorption through the oral mucosa. So we think that all of those things are fully disclosed in Lab Tech. And indeed, the argument that it was just a wish is just not true. There is a table of references. There is a detailed discussion of how to make a film, all of the components of the film. There's an example given. There's no dispute that what's not disclosed is the particular numbers that are included in Claim 17. Okay, on that point, Your Honor, that is and was a well-known pharmacokinetic characteristic of naloxone that was part of the European Medicines Association study published in 2006. It's got a copyright date on it, which tells you the values for naloxone that are right in the range that Claim 17 calls for. And that's outside of the disclosure, right? I'm sorry, outside of the Lab Tech? It's not in Lab Tech. Those numbers are not in Lab Tech. All the other pharmacokinetic numbers are in Lab Tech. But with respect to that set of AUC numbers, those are in this study from 2006 based on the Suboxone tablet. And that tablet, the characteristics of those tablets were replicated by RB itself, and that's the basis for the 832 patent claims. They made it into a film. Maybe someone could infer that or figure that out. I don't think there's any dispute about that. The question is, in the context of anticipation, whether it works to not have disclosure in the reference you're relying on and have to look elsewhere to bolster, to clarify, to inform what we're talking about. Okay, well, in that context, Your Honor, I believe the law is clear that you don't have to provide a disclosure of things that are well-known in the prior art. And there's the old machine fabric case. So are we talking inherency with respect to Claim 17? We're not talking inherency. We're talking about things that are well-known. It's like saying a temperature has to exceed the boiling temperature of water. We all know what that means. That means it has to be over 100 degrees centigrade. That is fully disclosed from that phrase without putting that number in. And similarly here, and there's case law that supports this proposition, that if there's information that's known to technologists in the field, then that information does not have to be part of the disclosure that's going to anticipate. Okay, so what would be so clearly known to those of skill in the art that you would have a mean AUC in the range of a site in Claim 17? Yes. For Naloxone. Yes, you would know that from the 2006 study, from the tablet insert, from all of the information about the Suboxone tablets, which when RB turned them into film, they had the identical pharmacokinetic characteristics. So contrary to the argument that RB makes about how difficult and strange this was, they were directly translated. And the Lab Tech reference itself talks about another sublingual product, Zofran, which is listed in Table A, just like the Suboxone tablet, and talks about turning that into a film form with detailed discussion of how to make the film and what kind of characteristics you would get. In fact, the Lab Tech reference says you want to mimic the pharmacokinetics of the tablet product. So you're relying on the Suboxone tablet label or data sheet? Yes, we're relying upon the label, the data sheet, the EMCA study. That's where it says specific claim range for Naloxone's mean AUC? Yes, Your Honor. Yes, Your Honor. Can you go back now to the discussion we were having with your friend, Judge Chen and I, I guess, about the process kind of question? It seems that the board did not, if I'm reading it correctly, on the enablement question, on anticipation, deal with the question of undue experimentation, right? And if that's the case, then isn't that a problem unless it really wasn't presented for a square before the board in that way? So do you have any comments or information you can give us in that regard? With respect to that, Your Honor, of course, the board went through the Lab Tech reference and took all of the teaching of that reference and said you would get there. You would get to the film with these characteristics, and the comment that they made about we're not persuaded that there's non-enablement here, which was the argument below, that was simply talking about all of the evidence they had that supported enablement and a limited amount on non-enablement. With respect to – and therefore they concluded that BDSI had sustained its burden, however you adjusted the burden of production and the burden of persuasion. Let me try to drill down a little more on this. Okay. As I saw what happened below in front of the board, when it came to the anticipation grounds for rejection, RB made an enablement argument, but its enablement argument was predicated on the great disparity in alleged bioavailability between GI tract absorption and sublingual absorption. So therefore Lab Tech doesn't enable these claims. When it came to the 103 proposed rejection, RB made a non-enablement type of argument again, but there they had related but different arguments about undue experimentation. I don't think they invoked N. Ray Wands, but it was the same idea of N. Ray Wands, and then had all kinds of evidence from their expert explaining how it's kind of tricky to figure out what is the right balance of various ingredients that you would need beyond the two active ingredients in order to make an effective film. So then the question is, the patent board ultimately, with respect to the 102 rejection that it adopted, just focused in and addressed the enablement arguments the patent order made with respect to the 102, and did not address the additional undue experimentation or non-enablement arguments that RB made for the 103. So the question is, should the patent board have said to itself, aha, RB is making all kinds of enablement arguments throughout its brief, some with respect to 102, different ones with respect to 103, and we as the patent board really, in respect to addressing the enablement question in the context of either 102 or 103, need to address all of the full basket of enablement arguments each time with respect to 102 and with respect to the 103. That is how I understand RB's position this morning. Is that correct or is that incorrect? Respectfully, Your Honor, I believe that is not a correct position. I think the board addressed everything that was put in front of them, and my colleague referenced a question of whether they waived the argument. Perhaps they did, but in any event, the board addressed everything in front of them and found really overwhelming evidence of both enablement and of no need for undue experimentation. Let me just articulate some of that. This record is full of it, but Dr. Johnston, again, RB's own expert, said that the bioavailability of buprenorphine in the gut was 5 to 15 percent. So when questioned at his deposition about the Suboxone tablet label, which says bioavailability is an average of 13.6 percent, a range of 5 to 25 to 24.9 percent, the question was, don't those overlap? Yes, those overlap. So the Suboxone tablet is talking about oral mucosal absorption. His testimony is talking about what's going on in the gut. So the evidence was overwhelming that the lab tech reference would give you what you needed to make a film that would have the appropriate bioavailability characteristics. And similarly, on the question of the need for experimentation, the beef that RB presented to the board was, gee, it's telling us make a film that mimics the pharmacokinetic characteristics of these tablets. It's giving us a list of them. It's showing us what those PK characteristics are. It shows us how to make a film, and as an example, it takes the drug that involves the active ingredient ondansetron, and it says, here's how you do it with ondansetron in great detail about how to do the film. So they're saying, we're still, geez, we still don't get it. How do you make a film? How do you make a film that has buprenorphine and naloxone? The board just didn't think there was any credibility to that position once Dr. Johnston's admissions were of record, and when our own expert, Dr. Feigl, said, I don't know what Dr. Johnston says is missing from lab tech, that's in claim 15. And in fact, Dr. Johnston admitted he couldn't find anything in lab tech, in claim 15, I'm sorry, that was missing in lab tech. So there was just overwhelming evidence that it taught you how to do it, it showed you how to do it. Now, when we get to the obviousness analysis, Your Honor, the question becomes, well, what's left here? If lab tech teaches you everything you need to know, then how do you address that? Well, the Yang reference, which is Arby's own partner's reference, and which is incorporated by reference in the 832 patent, it says, if you want to know how to make a pharmaceutical film, here's how to do it, look at the Yang reference. So the Yang reference tells you everything in detail about how to make a pharmaceutical film. So that was why the board said, well, if you take lab tech, and to the extent there's anything missing, namely not an explicit example of putting these things together in a film that uses buprenorphine and naloxone, it's in Yang. So we believe that that was an adequate 103 determination that it would be obvious over those two references. Thank you. Thank you, Your Honor. May I make just one more point, which is that in the discussion of obviousness, there was reference to commercial values and a lot of, a hue and cry about Arby that they weren't addressed. Well, they were addressed. They were explicitly addressed. Our own expert, Dr. Meyer, an economist, testified that there's no evidence on this record that shows any nexus between the film form of suboxone and the tablet and the commercial success. The tablet itself was very successful when they came out with the film with the identical characteristics. That continued to be successful. But there was no evidence that the film itself contributed to the commercial success. And to put the frosting on that cake, Dr. Johnston's declaration says that the 16 milligram dosage of suboxone film is not within the claims at issue here. Not within the claims. And that was hard to figure out because he listed all the dosages in his declaration up to the 16. But at deposition, he admitted it's not within the claims. What's the significance of that? That is the standard dosage that Arby recommends for its film product. So its standard dosage is not within the claims, showing no commercial success nexus to the film form. Thank you. First, the naloxone AUC. I don't have an A-site. Again, though, BDSI did not raise any issue as to waiver. So it's not surprising I don't have an A-site. If anything, that would counsel for remand were this the one issue. There was something that my friend said about the pharmacokinetics of the naloxone AUC. Naloxone AUC, and you can look at other references. This is formulation dependent. Lab Tech talks about a wish for a film with certain pharmacokinetics. There isn't any reason that a film with the listed pharmacokinetics, even were you able to obtain those, would have the naloxone AUC that's desirable. Which pharmacokinetics are achieved depend upon the formulation selected. We have a citation in Lab Tech showing that very thing with different dissolutions resulting from the choice of different inactive ingredients. I'm sorry, I misspoke. That's at table 15. Is the mean AUC that's listed in claim 17, is that also identified in a data sheet or some label with regard to suboxone templates? It's in the EMEA. It's not in the FDA labeling, I believe, for suboxone tablets. But if the person of ordinary skill in the art is able, if we disregard the fact that table A is about a tablet, and Lab Tech generally about the wish to have film versions of those tablets, if the person of ordinary skill in the art goes there and tries to make a film, there's no reason why they're going to end up with the naloxone AUC of claim 17. Certainly there was no evidence to that effect put on by BDSI. They don't argue that in their brief. They say inherency is a red herring, and there's no argument either about incorporation. And certainly we put the issue of disclosure at issue below, and I believe as to all claims, there isn't disclosure of any film with these pharmacokinetics, which I believe is required under the net money case, where the requirement is that there be a disclosure in the prior art of as arranged in the claim. So the elements as arranged in the claim, they simply aren't there. There was something about overlap. I don't really think that this issue about paroral dosage forms is, it's not, there was no, we're not arguing that every bit and speck of these active ingredients has to be absorbed transmucosally. There's clearly some, if one follows lab tech, there's some that will be absorbed transmucosally because that's the nature. This isn't a precise science, but clearly something that's designed for gastrointestinal delivery, and by that I mean not swallowing the film whole, which would be ludicrous. That was the question to Dr. Johnston. But when the film dissolves in the mouth, if you have a film that's designed to be delivered gastrointestinally, the contention was that you're not going to reach those pharmacokinetics that are claimed. The only way that the board reached a different conclusion was through the gymnastics about the naloxone AUC that is in the opinion. And I think also that tells us that the board was concerned with the naloxone AUC because it went through what we believed in our initial brief had to have been an inherency analysis, but it's a deficient one at that. Okay, thank you. We have your argument. Thank you.